UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § § § § § § § § § § § | **COMPLAINT FOR FORFEITURE *IN REM*** |
| **v.** | | |
| **APPROXIMATELY 8,544,170.3613 USDT** | | *CIVIL ACTION NO.* **26-cv-2330** |
| **Defendant, *in rem.*** | | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against approximately 8,544,170.3613 USDT, hereinafter referred to as "Defendant Property", and alleges as follows:

**STATEMENT OF THE CASE**

1.      Criminals believed to be located abroad, their associates, and conspirators together stole funds from multiple U.S. victims. The funds were then laundered through a series of virtual currency addresses, and sometimes virtual currency exchanges, to evade detection and hide the origin of the funds. The Federal Bureau of Investigation ("FBI") Washington Field Office investigated this matter and identified the Defendant Property, which constitutes proceeds traceable to those thefts and property involved in, and traceable to, this money laundering scheme.

2.      The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through

illegal activities, and most importantly, to recover assets that may be used to compensate victims.[1]

3. This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4. This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).

5. Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(2) because the property is subject to forfeiture under the laws of the United States and is controlled by Tether International S.A. de C.V. ("Tether"), which is domiciled in the country of El Salvador.

**NATURE OF THE ACTION AND STATUTORY BASIS FOR FORFEITURE**

6. The United States files this *in rem* forfeiture action to seek forfeiture of Defendant Property as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343, 1349, 2, and 3, and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. 1956(a)(1)(B)(i), 1956(h), 2, and 3.

7. Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8. 18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9. 18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, or any offense constituting

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

"specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense. A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

10.    18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

11.    18 U.S.C. § 1349 provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

12.    18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty of concealment of money laundering.

13.    18 U.S.C. § 1956(a)(2)(B)(i) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—knowing that the monetary instrument or funds

involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, commits international money laundering.

14. 18 U.S.C. § 1956(h) provides that any person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

## PROPERTY INFORMATION

15. The Defendant Property is approximately 8,544,170.3613 USDT, which is equivalent to 8,544,170.3613 in U.S. Dollars ("USD"). The Defendant Property is associated with the following twenty-seven virtual currency addresses ("Subject Virtual Currency Addresses"):

| | |
|---|---|
| SUBJECT ADDRESS 1 | TA3c4wBFcdZfEZkeiW6QhKJa9Kcwv1W55j |
| SUBJECT ADDRESS 2 | TBcfznw2PooPj5aPkB6AYwUWeoF8E72Gpo |
| SUBJECT ADDRESS 3 | TEsSgbNw7J4H5UMZWZWrL5nA4MuP5jc9oV |
| SUBJECT ADDRESS 4 | TGGSCJKPBw3mz1K7L8L41SaSW2DFM9Mgqr |
| SUBJECT ADDRESS 5 | TJ6RUZwBDJkcuUxwmUNxaWpMNhG6NyBAvN |
| SUBJECT ADDRESS 6 | TLxAtJzreTPWBHeiqxUSyu4fi5GjKRaoFB |
| SUBJECT ADDRESS 7 | TQXYaZo7Ngw8kFdohJ8i23j3PvEay2vCrL |
| SUBJECT ADDRESS 8 | TS9k5CvUYs1tXQiiHPP3dWSUFHrXctEHDK |
| SUBJECT ADDRESS 9 | TTcpAcWJorbyb3BXFAELGoLnV5SpnNNSiK |
| SUBJECT ADDRESS 10 | TUvuJHaRPKzzf16uYXZUwE3uFwD8pEMnYF |
| SUBJECT ADDRESS 11 | TWUrgar2oHhNZPmcboo3Fk5CndAbp62yyw |
| SUBJECT ADDRESS 12 | TXnyx2jJppWeK79w85264js3RzcrJ1edXz |
| SUBJECT ADDRESS 13 | TAp3RJm4E8tpzWhfY3wAS3Q1U6W8qfj2p9 |
| SUBJECT ADDRESS 14 | TPr7RMLZ2mc3o3Rs2Eym4992c9QJZvys5X |
| SUBJECT ADDRESS 15 | TQoXBvGnbDPyCVmkwEPCzJxj4pCzmDEMf8 |
| SUBJECT ADDRESS 16 | TRD9cngmDuuWExssUDiAVYXgEWtjVUUz9S |
| SUBJECT ADDRESS 17 | TVR28b62BK656d7xzsHYAKDbfZtDGTvVPW |
| SUBJECT ADDRESS 18 | TYk5GXFNpoTLXgpxFSmxuPhJcs51MFVGUa |
| SUBJECT ADDRESS 19 | THU2wURynjD2C2M128TC23RV8ART8EfCAx |
| SUBJECT ADDRESS 20 | TL5A1YCvTNypfQHspwRttpbUSXMt93EM89 |
| SUBJECT ADDRESS 21 | TQmJ6DXRuEbEyrThMi4BrhSjkCfc95B4YV |
| SUBJECT ADDRESS 22 | TNj3hA82arVQ5MM2RNKDqgxhrGem8qfk3b |

| SUBJECT ADDRESS 23 | TC8G1WqbzsNAjFMi58RdTG7XDs3ebDkQxn |
| SUBJECT ADDRESS 24 | TTmsFaDrofz7gHgEQAUqvLnT9atTW9bHGG |
| SUBJECT ADDRESS 25 | TUc8xE7yndCPkWf6WeaHB141k29KmtvhtR |
| SUBJECT ADDRESS 26 | TUgSsAB3pDjofFgEQnthJnfao1KvZQUSq5 |
| SUBJECT ADDRESS 27 | TWB5pVteZ5ce2pNG6iX2yaBs3rinXYa437 |

16.    The virtual currency associated with the Subject Address is altogether referred to as the "Defendant Property."

17.    The United States has yet to take custody and control of the Defendant Property, which is held, and was voluntarily frozen, by Tether.

## BACKGROUND CONCERNING VIRTUAL CURRENCIES AND DIGITAL ASSETS

18.    **Virtual Currency:** Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin (or BTC) and Ether (or ETH), are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

19.    **Blockchain:** A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and

historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all of their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether exists in its native state on the Ethereum network.

20.    Blockchain Bridge: A bridge protocol, also known as a cross-chain bridge, is a software application that enables the direct transfer of assets/value across different blockchains (e.g., from the Bitcoin blockchain to the Ethereum network). When a bridge protocol user initiates a transaction from one blockchain to another, the user specifies the number of coins or tokens (i.e., the value) that the user would like to send from the originating blockchain to the destination blockchain.

21.    **Blockchain Analysis:** Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

22.    **Virtual Currency Address:** A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

23.    **Intermediary Address:** An "intermediary address" in virtual currency tracing refers to a wallet address used in a virtual currency transaction that acts as a temporary stopping point between the original sender and the final recipient, often employed to obscure the true source or destination of funds by adding an extra layer of complexity to the transaction trail. Essentially, criminal actors use intermediary addresses as "middleman" addresses to obfuscate the flow of funds. The funds are transferred through the middleman/intermediary address for no legitimate purpose. This is especially obvious because each transfer requires fees, meaning it costs the criminal actors money in order to do these transactions.

24.    **Virtual Currency Exchange:** A virtual currency exchange ("VCE"), also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

25.    **Pass-Through Account:** A "pass-through" account is an account primarily used to transfer funds through a VCE's own addresses, often removing the link between the source of funds and the destination. Pass-through accounts often receive, then promptly transfer the funds without exchange activity, which is an unnecessary step that incurs transaction fees without a legitimate purpose. This effectively turns the VCE into a money laundering mixer.

26.     **Virtual Currency Wallet:** A virtual currency wallet (e.g., a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

27.     **Unhosted Wallet:** An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (e.g., a virtual currency exchange) to facilitate a transaction involving the wallet.

28.     **Decentralized Exchange:** A decentralized exchange (or "DEX") is a peer-to-peer marketplace where users can trade virtual currencies directly with other traders without centralized intermediaries. Users generally retain control over their virtual currency rather than entrusting a central authority to host funds in a centralized or "hosted" wallet. DEXs are operated by self-executing agreements written in code, known as "smart contracts," which automate the trading process. DEXs will algorithmically track the prices of various virtual currencies and often leverage locked reserves of virtual currencies (or other digital assets). These locked reserves are known as "liquidity pools," and they are often used to facilitate trades. DEXs are built on blockchains that support smart contracts, including Ethereum, and often levy fees for their services.

29.     **Transaction Fee:** A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (e.g., Bitcoin on the

Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether, or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

30.     **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

31.     **Tether:** Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

## STATEMENT OF FACTS

32.     On February 18, 2025, a witness contacted the FBI and informed agents that an 83-year-old Washington, D.C. resident was the victim of a cryptocurrency investment fraud ("CIF") scheme.  Through a combination of tracing and back tracing of victim funds, detailed below, agents identified and subsequently froze 27 virtual currency wallets containing the proceeds of the CIF scheme.  The total amount of virtual currency contained in these wallets is valued at approximately $8,544,170.36.

33.     A group of unidentified subjects ("UNSUBs") is operating a CIF scheme primarily through WhatsApp private investment groups.  These groups are created for the sole purpose of attracting potential victims, convincing victims to invest in the CIF by promising extremely lucrative returns, and scamming them.  The names of these groups often contain the word Alliance. A few known examples are DZ Alliance, SW Alliance, and WH Alliance.

34.     Sometimes victims are directed to these groups after being cold contacted by

someone purporting to be a woman with the last name Martin ("MARTIN"). MARTIN claims to be a member of the Alliance group and encourages victims to join the Alliance investment group. MARTIN does not always use the same first name between different victims and Alliance groups. A few known examples of MARTINs first name are "Stephanie" and "Amanda."

35.     MARTIN will guide an interested victim into the Alliance WhatsApp group and act as a one-on-one attendant to the victim. MARTIN will assist the victim in downloading an application for a cryptocurrency exchange platform.

36.     The app can be downloaded from a legitimate application store on a mobile device, lending further credibility to the scheme. The app and cryptocurrency exchange platform varies from victim to victim. A few of the known cryptocurrency exchange platforms are CAUCOIN, ROYCOIN, and MMOCOIN.

37.     The leader of the these groups is often referred to as Professor Quisenberry ("QUISENBERRY"). QUISENBERRY claims to be developing a cryptocurrency trading program in which artificial intelligence is used to determine when to buy and sell a specific virtual currency. QUISENBERRY does not always use the same first name in these groups. A few known examples of his first name are Dexter, Roland, and Damon.

38.     Victims are continually encouraged to invest by a constant stream of posts in the Alliance WhatsApp groups by members touting successful trades as well as posts by QUISENBERRY containing elaborate analysis of potential trades involving the fake virtual currency coin that can only be purchased on the aforementioned crypto currency exchange app.

39.     Once an unwitting victim is convinced to invest, MARTIN or others will assist the victim in transferring money from a legitimate cryptocurrency exchange to an unhosted wallet and then ultimately to a cryptocurrency address associated with the fake crypto currency exchange app.

40.    Once the victim funds are transferred to the fake crypto currency exchange app, the victim can make trades based on signals provided by the AI program.  At first, victims will almost always trade successfully and the balance on the app will show incredible returns.

41.    When a victim later attempts to withdraw any profits from the platform, they are typically unable to and provided excuses.  The victim is then told they must send additional money to withdraw.  Occasionally, the UNSUBs will allow a victim to withdraw a comparatively small amount early in the scheme to build trust and add legitimacy to their purported venture.  In at least one example of this scheme, the victim was told that they lost all of the money in their trading account due to a bad trade, inducing the victim to begin investing even more to cover his losses.

42.    Ultimately the victims lost all or most of the money they invested because, since the beginning, the investment platform was fake, and all the money a victim deposited went to a virtual currency wallet controlled by the UNSUBs.

43.    QUISENBERRY and MARTIN are not real people, and the use of "Professor" was to create an air of legitimacy. In reality, they are characters created by UNSUBs for the purpose of furthering this scheme.

*Initial Victim S.K.*

44.    The FBI was notified of the aforementioned Victim S.K. on February 18, 2025, when a witness contacted the FBI and told agents that an 83-year-old in Washington, D.C., S.K., was the victim of a CIF scheme.  The witness indicated to the FBI that S.K. is unable to speak English and provided the contact information for S.K.'s son-in-law, A.H., who lives next door to S.K.  In a subsequent interview with A.H., A.H. explained that his father-in-law, S.K., had been talking to a woman online purportedly named Amanda Martin and fallen victim to a scam. This scam involved an investment club on WhatsApp group called DZ Alliance Partner VIP, which used an investment platform called web.caucoin.vip.

45.     Communication between MARTIN and S.K. primarily occurred on WhatsApp and Telegram.  A.H. provided chat logs of WhatsApp group DZ Alliance Partner VIP. The leader of the group is purportedly named Professor Damon Quisenberry.  In the chat, QUISENBERRY claimed to have launched the "Alliance Leader 200-500% Profit Challenge Plan" a trading program aided with AI.  QUISENBERRY claimed returns of over 200% using the program's AI signals on when to trade cryptocurrency.  QUISENBERRY also posted alternate methods of purchasing cryptocurrency for the purposes of avoiding banks.  In addition to QUISENBERRY and MARTIN, there are multiple other members consistently posting about successful trades.

46.     Between January and February, S.K. wired approximately $282,000 in fiat currency from his Wells Fargo Bank account to his Coinbase account.  S.K. then purchased cryptocurrency on the legitimate cryptocurrency exchange Coinbase, transferred it to a non-custodial wallet opened by S.K., and subsequently transferred it to a wallet address S.K. believed to be associated with the CAUCOIN trading platform. Upon reviewing the application's dashboard, S.K. was led to believe that he had made multiple successful trades with CAUCOIN and saw his balance grow to USD $500,000.

47.     When A.H. and S.K became suspicious of the investment, an attempt to withdraw some of S.K. victim funds was made but only resulted in recovering a small amount of Ethereum cryptocurrency valued at approximately $200.  S.K. was told that he would be unable to withdraw the remainder of his balance until a later date. At this point S.K realized he was being scammed. As of the date of this affidavit, S.K. has not received any additional funds.

*Victim P.V.*

48.     P.V. was contacted in December 2024 by a woman purportedly named Stephanie MARTIN.  MARTIN is a member of a private WhatsApp investment group called SW Alliance. P.V. was invited to join SW Alliance where MARTIN and others convinced P.V. to invest with

SW Alliance.

49.     The SW Alliance investment group is led by a man purportedly named Professor Dexter Quisenberry.  As advertised in the WhatsApp group chat, the investment group trades cryptocurrency by following signals generated by an AI program developed by QUISENBERRY. Members of the group receive the signal in a telegram chat message and rapidly purchase a fake virtual currency called ROYCOIN that is only found on a fake investment platform, RCN exchange.

50.     MARTIN guided P.V. on how to transfer money from his existing cryptocurrency exchange account with Coinbase to a non-custodial wallet and subsequently to a virtual currency wallet associated with RCN exchange.

51.     To start investing, P.V. was required to send $300.  After sending the initial amount and trading using the signals, P.V. saw his RCN exchange balance grow to approximately $3,000 in the application.

52.     At this point P.V. was convinced of the legitimacy of SW Alliance and RCN exchange.  At that point, the subjects explained to P.V. that there were multiple levels of investors. The highest level investors were required to invest the most money but had the highest rate of guaranteed return at 500%.

53.     P.V. decided to send approximately $500,000 to RCN Exchange in order to be a high level investor.   P.V. proceeded to trade on RCN exchange, at the direction of QUISENBERRY and others, and his balance increased exponentially with successful trades until P.V. attempted a trade that was unsuccessful and he lost the entire balance of his RCN exchange account in what is described as one bad trade.

54.     Following the loss, QUISENBERRY told P.V. that he would work one on one

with P.V. to earn the money back on the condition that P.V. invested $1,000,000.

55.     P.V. sent approximately $1,000,000 to RCN exchange and traded under the personal direction of QUISENBERRY.  P.V. earned back the initial loss plus more until he once again lost the entire balance of his account to another bad trade. P.V. proceeded to send an additional $1,000,000 that he ultimately lost to yet another alleged bad trade.

56.     P.V. then withdrew an additional $1,000,000 from his retirement account with the understanding that the money would need to be returned within a certain time period to avoid a significant tax penalty.  P.V. sent the money to RCN exchange and again lost the money when the RCN exchange app stopped working mid trade.

57.     At this point P.V. realized that he was being scammed.  P.V. continued to talk to QUISENBERRY.  QUISENBERRY explained to P.V. that the loss was unfortunate, and he would provide P.V. with a $1,000,000 loan in his RCN exchange account.  P.V. traded with the money provided by QUISENBERRY until it reached an amount that would cover P.V.'s losses.  P.V. attempted to withdraw the money from RCN Exchange but was blocked by the exchange and told he would need to pay an additional 30% service fee to withdraw his money.

58.     P.V. understood that he was scammed and refused to send any additional funds. Between December 2024 and February 2025, PV lost approximately $3,500,000.

*Additional Victims*

59.     Through cryptocurrency tracing conducted by the FBI, an additional group of 41 potential victims were identified, bringing the victim total to 43.  Of the 41 additional potential victims, 15 have made reports to the FBI regarding having fallen victim to a CIF scheme bearing some or all of the identifiers described above.

60.     Additionally, as a result of tracing conducted by the Alabama Securities Commission investigation that will be further explained in this affidavit, an additional 51 potential

CIF scheme victims were identified whose funds were ultimately comingled in virtual currency wallets containing funds from the previously described CIF scheme. Of those 51 potential victims, the original Alabama Securities Commission complainant and 7 other victims also made reports to the FBI of falling victim to a CIF scam. The CIF scheme reported by the Alabama Securities Commission victims bears similarities to the aforementioned QUISENBERRY CIF scheme but does not contain the same identifiers. In my training and experience, perpetrators of CIF schemes will often use the same money laundering networks, which explains the comingling of funds from two seemingly independent CIF schemes.

## B. Tracing illicitly obtained funds to the SUBJECT ADDRESSES

61. Throughout the investigation, FBI cryptocurrency subject matter experts traced each of S.K.'s and P.V.'s cryptocurrency transactions. Although S.K. and P.V. did not initially send cryptocurrency to the same exact cryptocurrency address, after a series of subsequent transactions, large portions of their losses were quickly consolidated and comingled in the same addresses.

62. In cryptocurrency confidence fraud schemes, it is common to create layers of transactions to further obfuscate the location and movement of funds. Often, a new cryptocurrency address is created for each individual victim, or sometimes for small groups of individuals, to which to send their initial transactions. These addresses are commonly referred to as '0-Level" addresses by law enforcement. From there, the funds are quickly withdrawn by the subjects and moved into the next layer of addresses, which will consolidate multiple 0-Level addresses into a single address. Following this consolidation, the subjects are more easily able to quickly move large amounts of cryptocurrency through their laundering networks.

*Flow of S.K.'s Funds*

63.     Between about January 4, 2025, and February 14, 2025, S.K. completed five transactions related to the scheme, as represented by the table below:

| TIMESTAMP | SENT TO | AMOUNT BTC | AMOUNT USD |
|---|---|---|---|
| 1/4/2025 14:07 | 32QVE9HHBJWDAzi6rsfQ24KuPxygQjffga | 0.01438191 | 1414.11 |
| 1/22/2025 8:53 | bc1qnz2peapwmu3x9gdlea5qupc8j06ktmkw47rl8z | 0.05858883 | 6084.75 |
| 2/6/2025 7:38 | bc1qnz2peapwmu3x9gdlea5qupc8j06ktmkw47rl8z | 0.25070107 | 24434.56 |
| 2/11/2025 7:21 | bc1qnz2peapwmu3x9gdlea5qupc8j06ktmkw47rl8z | 0.99814948 | 96841.06 |
| 2/14/2025 8:17 | bc1qnz2peapwmu3x9gdlea5qupc8j06ktmkw47rl8z | 0.98266314 | 94974.39 |
| Total | | 2.30448443 | 223748.87 |

64.     The funds sent by S.K. in the first transaction to 32QVE9HHBJWDAzi6rsfQ24KuPxygQjffga, were quickly withdrawn from that address, and sent to 37T4Qb6GVpuo1e8eLvgQW41ax2hJs9YsbM ("32QV"). From there, 32QV made a series of small transactions in BTC, often in the range of $100-$500 worth of BTC, in which the funds were sent to various cryptocurrency exchanges accessible by US Based customers.

65.     Scammers in these types of cases will occasionally provide their victims with small amounts of "returns" on their investments early on in their interactions. These "returns" serve to prove to more suspicious victims that their investments are paying off, thereby encouraging the victims to continue investing in larger amounts. The withdrawals from 32QV, containing S.K.'s first transaction, are consistent with these methods.

66.     The following four transactions sent by S.K. were all sent to the same address,

bc1qnz2peapwmu3x9gdlea5qupc8j06ktmkw47rl8z ("bc1q"), which is representative of a "0-Level" address. S.K. is the only individual to send funds to bc1q.  Following each of S.K.'s transactions, often within minutes or hours, subjects withdrew the same amount from bc1q and sent it to the address 32QV, the same address S.K.'s first transaction was sent to.  A visual representation of these transactions is below:



67.     32QV is a consolidation address for this scam, to which multiple victim's funds were eventually sent, as will be discussed later in this affidavit.  As previously described, individual victims are often provided with a new, previously unused, cryptocurrency address to send their initial transactions to.  These addresses are commonly referred to as '0-Level" addresses by law enforcement.  From there, the funds are quickly withdrawn by the subjects and moved into the next layer of addresses, which will consolidate multiple 0-Level addresses into a single address. Following this consolidation, the subjects are more easily able to quickly move large amounts of cryptocurrency through their laundering networks.

68.     In the case of S.K.'s funds, upon transfer to 32QV, the funds were consolidated

and then moved through the laundering network in three groups.  For the purposes of the affidavit, they will be referred to as the 'Green', 'Orange', and 'Purple' flows.

*Green Flow*

69.    Following the transfer of 0.982657 BTC, valued at approximately $95,505.00, to 32QV, the subject(s) then withdrew this BTC, comingling it with other BTC it received from other victims of this scam, and sent a total of 8.12946101 BTC to bc1qdu0rpgnxczlyeearvhjeaf8ukh8p85c7gq5vrr.  Over the ensuing months, this chain continued, further comingling funds traceable to S.K. with funds from additional victims, ultimately conducting five additional transactions and depositing a total of 8 BTC in address 122n5z4TnbegMh1WGQSuuzfpefp6a8dpXz on June 24, 2025, at around 2:46:47 PM.

70.    Starting hours later, on the same date, subjects began withdrawing the BTC held in 122n5z4TnbegMh1WGQSuuzfpefp6a8dpXz and sent it to ChangeNow.io, a decentralized cryptocurrency exchange service (DEX), which allows users to exchange one type of cryptocurrency for another.  Throughout the rest of June 24, 2025, through the morning of June 25, 2025, subjects conducted a total of 22 transactions involving address 122n5z4TnbegMh1WGQSuuzfpefp6a8dpXz ("122n"), sending approximately 9.56694688 BTC, valued at approximately $1,017,728.83, through ChangeNow.  A visual of this transaction chain is below:



71.    Law Enforcement requested records from ChangeNow regarding the 22 transactions sent to ChangeNow from 122n, requesting the cryptocurrency type the BTC was

swapped for, the address(es) it was sent to, and the specific output transaction hashes for each input from 122n. The records from ChangeNow indicate that all 22 transactions were swapped from BTC to USDT on the Tron ("TRX") network, and all 22 transactions were sent to the same address, TP2KN9b68nAi9ptWLQuZ2w3v9SSiUX2jXC ("TP2K"). In total, approximately 1,002,881.62 USDT was deposited in TP2K from ChangeNow.

72.     Prior to the 22 transactions from ChangeNow to TP2K, TP2K held a balance of approximately 72,870.60 USDT, which was deposited from a different bridging service, hours before the transactions from ChangeNow began being sent to TP2K. Those funds were then comingled with the funds from the ChangeNow deposits, and over the course of June 24, 2025, through July 25, 2025, TP2K conducted three large transactions, totaling 1,075,738.407518 USDT, all of which were sent to TUc8xE7yndCPkWf6WeaHB141k29KmtvhtR ("TUc8").

73.     Within minutes of receiving each transaction, TUc8 began to continue the laundering of the funds. On June 24, 2025, 100,000 USDT traceable to the ChangeNow deposits, and thus S.K., were sent to TL5A1YCvTNypfQHspwRttpbUSXMt93EM89 ("TL5A"). Hours later, TL5A sent 70,500 USDT to TVR28b62BK656d7xzsHYAKDbfZtDGTvVPW ("TVR2"). Following these transactions, the USDT held in TL5A and TVR2 were frozen at the request of Law Enforcement. Further details regarding the freezing of these addresses will be discussed later in the affidavit.

74.     Similarly, on July 25, 2025, TUc8 sent 100,000 USDT of traceable funds to TMkXMhVNPpfRBwfsodsz9b9pLMj7777777. Hours later, TMkXMhVNPpfRBwfsodsz9b9pLMj7777777 sent 100,000 USDT to TC1wy77MSRM1fxfNVdsEgCefFmDdTZHj8g. Hours later, TC1wy77MSRM1fxfNVdsEgCefFmDdTZHj8g, in turn, sent 100,000 USDT to

TRD9cngmDuuWExssUDiAVYXgEWtjVUUz9S ("TRD9"). Following this transaction, the USDT held in TRD9 was also frozen at the request of law enforcement.

75.    Also on July 25, 2025, TUc8 sent two additional transfers; 500,000 USDT was sent to TPr7RMLZ2mc3o3Rs2Eym4992c9QJZvys5X ("TPr7") and 96,000 USDT was sent to TTmsFaDrofz7gHgEQAUqvLnT9atTW9bHGG ("TTms"). Following these transfers, the USDT held in TPr7 and TTms was frozen at the request of Law Enforcement. A visual representation of these transactions is below, with addresses that have been frozen shown in red:



*Orange Flow*

76.    Following the transfer of 0.05857395 BTC from S.K. on January 22, 2025, valued at about $6,221.00 to 32QV, subjects withdrew this BTC, comingling it with other BTC it received from other victims of this scam, and sent a total of 3.83977329 BTC to bc1qqfg2txjuf7xzsfjcazn8ak29j9fkff7j74r9ml. Hours after this deposit, the BTC was transferred from bc1qqfg2txjuf7xzsfjcazn8ak29j9fkff7j74r9ml to 18vxUXzT3iwENC85Vaj3HocLC7cMY6ksan ("18vx"), where it was comingled with funds from additional victims[2], growing to a total of approximately 35.0953491 BTC.

77.    This BTC remained in 18vx since it's deposit, on or about January 30, 2025, until around March 21, 2025, when 35.09520795 BTC was sent to

---

[2] The funds from additional victims that S.K.'s funds are commingled with will be further explained in the section titled "Flow of the Overall Scheme and Identification of Additional Victims"

37yEfRhhFYxkLJujMvVVyXEnxRF8x1fkkb ("37yE").  The BTC remained in 37yE from about March 21, 2025, until about April 27, 2025, when the entire contents were sent back to 18vx.  In the intervening period, 18vx was largely dormant, conducting no additional transfers.  In my training and experience, This pattern of moving cryptocurrency out of one address, leaving it for a period of months, and then returning it, is indicative of money laundering.  Often, launderers will move their funds into "holding" wallets for long periods of time, hoping that as time passes, investigators lose track, forget about, or otherwise do not further track the whereabouts of those funds. A visual representation of these transactions is below:



78.    Following the return of the 35.09519345 BTC to 18vx on April 27, 2025, hours later, the BTC was sent out of 18vx again, this time being split into two separate deposits, one deposit of 10 BTC to 3QPvdgJqzhMJiidL1rh6fnydzXa5ppz1TD (this transaction will be discussed further in the *Purple Flow* section) and 25.09516995 BTC sent to 1C7SqY3HjYbFrPa9RBA8HoGsyHKfDcNtzE ("1C7S"), where it remained until about May 8, 2025.

79.    On or about May 8, 2025, 25.095146 of BTC was transferred out of 1C7S, and split into two deposits.    Of those two deposits, 10 BTC was sent to 19LgtRaJboKkhBdRgX6ZvFZuzAshhtLZ5e ("19Lg") on May 8, 2025, at around 1:04 PM.

80.    Minutes later at around 1:31PM, just as 122n did, 19Lg began to send all 10 BTC

to ChangeNow.  Between May 8, 2025, and May 9, 2025, 19Lg transferred a total of 10 BTC, valued at approximately $1,029,394.00, to ChangeNow over the course of 24 transactions.  A visual representation of these transactions is below:



81.    Law Enforcement requested records from ChangeNow regarding the 24 transactions sent to ChangeNow from 19Lg, requesting the cryptocurrency type the BTC was swapped for, the address(es) it was sent to, and the specific output transaction hashes for each input from 19Lg.  The records from ChangeNow indicate that all 24 transactions were swapped from BTC to USDT on the Tron ("TRX") network, and sent to one of three addresses, TGfHDHusZJbCvpo6eoV2YRzakt4KLhwBuW ("TGfH"), which received six transfers, totaling about 238,035.46 USDT, TRJJTy8fbfsXaQSuWq1fo4DPPXLi8xzuVp ("TRJJ"), which received 13 transfers, totaling about 543,677.61 USDT, and THVy59tRrzduvj2irhDBRz2nqfG4iyhwP3 ("THVy"), which received five transfers, totaling about 215,454.47 USDT.

82.    TRJJ exclusively received funds related to the ChangeNow swap sent by 19Lg, whereas both TGfH and THVy received funds from additional swaps conducted using ChangeNow from other BTC addresses related to the same scam.  These funds were comingled in TGfH and THvy.  On the same date the ChangeNow swaps were completed, May 9, 2025, all three of TGfH, TRJJ, and THVy, sent all USDT they held to TWCVZCrt6hk3rM5ukfUqiuo8ReNHpdrP55

("TWCV"). Specifically, TGfH sent approximately 303,442.576151 USDT to TWCV, TRJJ sent approximately 543,668.746658 USDT, split into two total transfers, to TWCV, and THVy sent approximately 500,000 USDT to TWCV. In total, TWCV received approximately 1,347,111.322809 USDT of funds, including all of the approximately 997,167.54 USDT traceable to the ChangeNow swap conducted by 19Lg.

83.    Within minutes to hours of receiving these transfers, TWCV began transferring the USDT to other Tron addresses. Of these transfers, hours after receiving 374,272.03815 USDT from one of the two transfers from TRJJ to TWCV, TWCV transferred 370,000 USDT to TUgSsAB3pDjofFgEQnthJnfao1KvZQUSq5 ("TUgS"), where it remained until about May 12, 2025. On or about May 12, 2025, TUgS transferred 350,000 USDT to TRQpt56MdTxrq75cXhBVuTCXLPPQuP8Jcx ("TRQp"), where it remained until about June 12, 2025. Starting on June 12, 2025, TRQp began transferring that USDT, of which, 69,900 USDT was sent to TYCgqRdh5tmrBQ1GNU6khtBs8kzW9Wq1Wh ("TYCg") on June 21, 2025. Days later, on or about June 28, 2025, TYCg sent 69,900 USDT to TNj3hA82arVQ5MM2RNKDqgxhrGem8qfk3b ("TNi3"). Following this transfer, the USDT held in TNi3 was frozen at the request of law enforcement.

84.    TRQp conducted an additional transfer on or about June 27, 2025, in which TRQp sent approximately 200,000 USDT to TC8G1WqbzsNAjFMi58RdTG7XDs3ebDkQxn ("TC8G"). Following this transfer, the USDT held in TC8G was frozen at the request of law enforcement.

85.    In addition to the funds that TUgS had received from the initial withdrawal of 370,000 USDT from TWCV, TUgS also received funds traceable to other victims in the scam[3],

---

[3] The commingling of funds held in and laundered through TUgS, which are traceable to additional victims,

which it received from TUc8, an address involved in the *green flow* of funds.  As a result, although TUgS did not hold funds directly traceable to S.K. at the time, it did hold funds traceable to other victims, and the USDT held in TUgS was also frozen following a request from law enforcement.  A visual representation of these transfers is depicted below, with addresses that are frozen show in red:



*Purple Flow*

86.     Following the February 6, 2025 transfer of 0.25069 BTC from S.K., valued at about $24,299.00, and 0.998141 BTC, valued at about $97,285 to 32QV, the subjects then combined and withdrew the total of 1.24883103 BTC, comingling it with other BTC it received from other victims of this scam, and sent a total of 13.361316 BTC to bc1q4kzhhyh2jxywqa652zjsmgn5pwm5qen96cnh8l on or about February 11, 2025.  Hours after this deposit, bc1q4kzhhyh2jxywqa652zjsmgn5pwm5qen96cnh8l transferred 13.36131215 BTC to 3HkxK3y16XaVvvimKUsYvzhp1f6wKqWscs ("3Hkx"), where it was comingled with funds from additional victims, growing to a total of approximately 39.75373031 BTC.  The BTC remained in 3Hkx until about March 21, 2025.

87.     In an almost identical pattern to that described in the *Orange Flow* section, on March 21, 2025, 3Hkx withdrew all 39.75373031 BTC and sent it to 332bcGv1sQv895tcLsVrubJgK2VD7xbJhL, where it remained until about April 27, 2025.  On or about April 27, 2025, at around 2:02 PM, 332bcGv1sQv895tcLsVrubJgK2VD7xbJhL transferred

_____

will be further explained in the section titled "Flow of the Overall Scheme and Identification of Additional Victims"

39.75361216 BTC back to 3Hkx.  A visual representation of these transactions can be seen below:



88.    Hours later, at around 3:51 PM, 3Hkx withdrew 39.75361216 BTC, and transferred it to two different addresses.  10 BTC was sent to 3QPvdgJqzhMJiidL1rh6fnydzXa5ppz1TD ("3QPv") and approximately 29.75359446 BTC was sent to 36gnSmVs5GYDiQWzjHD9aDBzBTBJzca6fr ("36gn").  Approximately 22 minutes later, at around 4:13 PM, 36gn withdrew 29.75359446 BTC, also splitting it between two addresses, sending 10 BTC to 3QPv and 19.75357676 BTC to 3G1ExLsJF4FCypv5SGGHG3AxDnR2bXBKqi ("3G1E").  About 41 minutes later, 3G1E repeated the process, withdrawing 19.75357676 BTC, of which another 10 BTC was sent to 3QPv, and the remaining 9.753559 BTC sent to 38kLCQQ2u94rTYzA5aPcjKHFn6ihk1e7rK.

89.    Following the three transfers of 10 BTC to 3QPv, 3QPv received one final transfer of 10 BTC, which is the previously mentioned transfer in the section regarding the *Orange Flow* from 18vx to 3QPv at around 5:35 PM on or about April 27, 2025.  In total, 3QPv received approximately 40 BTC, valued at about $3,786,272.00, related to the *Purple and Orange* laundering flows.

90.    In addition to the above described 40 BTC transferred to 3QPv, on or about April 25, 2025, 3QPv received an additional approximately 45 BTC traceable to other victims of this

scam.  Of the 45 BTC sent to 3QPv on or about April 25, 2025, approximately 28.5 BTC was sent directly from 3Hkx, with the remaining 16.5 BTC being sent from bc1p7pwqnm0j45dly8desyjfqrfz90m9nkaqae7mxh78qy4rvnx95ldsxsyx9h ("bc1p7p"), an address which also received funds from additional victims.

91.    Following each of the three deposits of 10 BTC from the Purple flow, and following the one deposit of 10 BTC from the Orange Flow, within a matter of minutes, 3QPv withdraws the funds and transfers them to 13ueM48pU7d9gBwvh4Reefi6yFCyZT3wjW, as demonstrated by the below chart:

| Date | Address | Direction | Amount |
|---|---|---|---|
| 2025-04-27 15:51:41.000Z | 3HkxK3y16XaVvvimKUsYvzhp1f6wKqWscs | IN | 10 |
| 2025-04-27 16:02:18.000Z | 13ueM48pU7d9gBwvh4Reefi6yFCyZT3wjW | OUT | -9.9999942 |
| 2025-04-27 16:13:17.000Z | 36gnSmVs5GYDiQWzjHD9aDBzBTBJzca6fr | IN | 10 |
| 2025-04-27 16:23:31.000Z | 13ueM48pU7d9gBwvh4Reefi6yFCyZT3wjW | OUT | -9.99999565 |
| 2025-04-27 16:51:20.000Z | 3G1ExLsJF4FCypv5SGGHG3AxDnR2bXBKqi | IN | 10 |
| 2025-04-27 16:56:40.000Z | 13ueM48pU7d9gBwvh4Reefi6yFCyZT3wjW | OUT | -9.9999956 |
| 2025-04-27 17:35:39.000Z | 18vxUXzT3iwENC85Vaj3HocLC7cMY6ksan | IN | 10 |
| 2025-04-27 17:52:05.000Z | 13ueM48pU7d9gBwvh4Reefi6yFCyZT3wjW | OUT | -9.99999565 |

92.    13ueM48pU7d9gBwvh4Reefi6yFCyZT3wjW is an address which is associated with an account held at the cryptocurrency Exchange Binance.

93.    In fact, except for a lone transfer of approximately 9.999996 BTC that was sent to address bc1q0xhcdw9k4tce44qr2yl8hwz4mlnvdy89xqdlw9nwcvfk6uwulv5q4g2psx, every other transfer from 3QPv was sent to13ueM48pU7d9gBwvh4Reefi6yFCyZT3wjW, which received a total of approximately 74.99995861 BTC, valued at approximately $7,067,773.00, of funds from 3QPv.  A visual representation of these transactions can be seen below:

94.     Following the above-described transfers on April 27, 2025, from 3QPv to to13ueM48pU7d9gBwvh4Reefi6yFCyZT3wjW, law enforcement obtained account information for the Binance Account associated with to13ueM48pU7d9gBwvh4Reefi6yFCyZT3wjW.   The account was created on or about March 25, 2025, and is registered to Junxiong Chen ("CHEN"), a Chinese national using email address sm6cqp2h9q@privaterelay.appleid.com.    Despite providing their country of residence as China, IP logs for this account show that logins were conducted using IP addresses which resolve exclusively to Cambodia, predominantly in the Phnom Penh, Takeo, and Sambuor regions.



95.     Upon the creation of CHEN's account, approximately 300 USDT was deposited into it between March 25, 2025.  CHEN then conducted a trade within Binance, selling 221.99346 USDT for approximately 971.1 TRX.   On or about March 29, 2025, CHEN withdrew 970.12890000 TRX, sending it to TMBPuoHBzyimo63Sr37fNb9MFwabrrACNW ("TMBP"). This is the first deposit and withdrawal conducted by CHEN's account, and the transfer of 970.12890000 TRX is the first transaction ever conducted by TMBP.  The transfer of the TRX to TMBP represents its initial activation, or gassing.

96. On the Tron Blockchain, Energy is the term used for the fee required to successfully conduct a transaction, though it is often colloquially referred to as "gas." As the gas fee is always paid in the form of TRX, if one wants to transact using Tokens, such as USDT, they must have TRX in their address, in addition to the Tokens, to pay the transaction fee to send the Tokens. If one address on the Tron blockchain sends a second address gas, it directly enables the second address's ability to transact. Based on my knowledge and experience, addresses that are connected by gas payments may be controlled by the same entity or have a vested interest in another address's ability to operate on the Tron blockchain.

97. As previously described, CHEN's account received a total of approximately 74.99995861 BTC, valued at approximately $7,067,773.00, of funds from 3QPv over the course of nine total transactions. Following each of these deposits into CHEN's account, the BTC was then traded for an equivalent amount of USDT and then sent to TMBP. In total, CHEN sent approximately 7,063,143 USDT to TMBP over the course of nine transactions, occurring on or about April 25, 2025, through Aril 27, 2025.

98. Following each transfer TMBP received from CHEN's Binance account, TMBP then further sent the funds to TLxAtJzreTPWBHeiqxUSyu4fi5GjKRaoFB (TLxA). These transfers from TMBP to TLxA occur within minutes, in some cases within seconds, of TMBP receiving funds from CHEN. In total, TMBP sent TLxA approximately 6,978,384.7 USDT, across nine transactions, traceable to the funds withdrawn from CHEN's account.

99. Upon receipt of each transfer, TLxA, just like TMBP, began to transfer funds out of TLxA within minutes, and in some cases seconds, of receipt. Between April 25, 2025, and April 27, 2025, TLxA sent a total of 5,619,151.47 USDT to eleven different addresses. Those addresses and the amounts they received from TLxA are broken out in the table below:

| Address | USDT Received from TLxA |
|---|---|
| TUvuJHaRPKzzf16uYXZUwE3uFwD8pEMnYF | 475,880 |
| TXnyx2jJppWeK79w85264js3RzcrJ1edXz | 469,000 |
| TWUrgar2oHhNZPmcboo3Fk5CndAbp62yyw | 469,800 |
| TGGSCJKPBw3mz1K7L8L41SaSW2DFM9Mgqr | 467,000 |
| TEsSgbNw7J4H5UMZWZWrL5nA4MuP5jc9oV | 518,000 |
| TQXYaZo7Ngw8kFdohJ8i23j3PvEay2vCrL | 510,000 |
| TJ6RUZwBDJkcuUxwmUNxaWpMNhG6NyBAvN | 430,000 |
| TA3c4wBFcdZfEZkeiW6QhKJa9Kcwv1W55j | 490,000 |
| TBcfznw2PooPj5aPkB6AYwUWeoF8E72Gpo | 470,000 |
| TTcpAcWJorbyb3BXFAELGoLnV5SpnNNSiK | 920,700 |
| TS9k5CvUYs1tXQiiHPP3dWSUFHrXctEHDK | 398,771.47 |

100.    Prior to these transactions, none of the above addresses had ever conducted an incoming or outgoing transaction, therefore, the entire contents of each address are directly traceable to the funds withdrawn from CHEN's account.

101.    Following these transactions, the USDT balance in each of the above eleven addresses was frozen at the request of Law Enforcement.  Additionally, the USDT balance held in TLxA, which still held 327,087.656245 USDT traceable to the transactions from CHEN's account, was also frozen at the request of law enforcement.  A visual representation of these transfers is depicted below, with addresses that are frozen show in red:



*Flow of P.V.'s Funds*

103.    Between about January 4, 2025, and February 6, 2025, P.V. completed 19 transactions related to the scheme, all sent to bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey ("bc1qav") as represented by the table below:

| TIMESTAMP | SENT TO | AMOUNT BTC | AMOUNT USD |
|---|---|---|---|
| 1/4/2025 16:05 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 0.6 | 58598.76288 |
| 1/11/2025 21:25 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 1.05673739 | 99942.93665 |
| 1/13/2025 23:53 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 1.05928225 | 100000.2065 |
| 1/14/2025 4:32 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 1.05262244 | 99880.02283 |
| 1/15/2025 14:03 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 2.52676182 | 250000.8895 |
| 1/16/2025 1:23 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 1.56483326 | 156308.3146 |
| 1/17/2025 2:47 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 1.34383117 | 136607.3149 |
| 1/23/2025 0:12 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 1.58385919 | 164173.3271 |
| 1/23/2025 19:12 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 1.15741787 | 122096.0724 |
| 1/24/2025 7:56 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 0.44079025 | 46283.46328 |
| 1/24/2025 20:43 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 3.12405811 | 330592.4975 |
| 1/27/2025 15:47 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 2.61345479 | 266601.5962 |
| 1/28/2025 17:54 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 3.07609572 | 314582.4665 |
| 1/29/2025 20:27 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 2.95669516 | 306417.7518 |
| 2/3/2025 15:18 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 0.54630998 | 52813.50467 |
| 2/4/2025 17:11 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 1.34548342 | 133372.0598 |
| 2/5/2025 18:31 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 0.31824272 | 31062.16624 |
| 2/6/2025 16:07 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 0.42569504 | 41424.97834 |
| 2/6/2025 20:30 | bc1qavgcy8e4xpwyqx64j43et6usvzg34hk03p33ey | 7.71999559 | 740891.0163 |
| **Total** | | 34.51216617 | 3,451,649.35 |

104.    Similar to the first transaction conducted by S.K., the funds from P.V.'s first transaction were moved from the '0-level' wallet P.V. sent funds to (bc1qav), to a consolidation address, 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u ("3C57"), and then to a third address, where the funds were sent in a series of small transactions BTC, often in the range of $100-$500 worth of BTC, in which the funds were sent to various cryptocurrency exchanges accessible by US Based customers.

105.    The remaining transactions conducted by P.V. followed the same pattern to that of

S.K., in that following every transaction sent to bc1qav, the funds were quickly withdrawn and

transferred to 3C57.  The transactions to 3C57 often took place within minutes to hours after

bc1qav received funds from P.V., as demonstrated by the table below:

| TIMESTAMP | SENT TO | AMOUNT BTC | AMOUNT USD |
|---|---|---|---|
| 1/4/2025 16:45 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 0.59999445 | 58,598.22 |
| 1/11/2025 22:26 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 1.05673073 | 100,302.99 |
| 1/14/2025 0:10 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 1.05927115 | 100,129.00 |
| 1/14/2025 4:55 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 1.05261578 | 99,879.39 |
| 1/15/2025 14:33 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 2.52675738 | 250,000.45 |
| 1/16/2025 1:39 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 1.56482549 | 156,307.54 |
| 1/17/2025 2:58 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 1.34382229 | 136,606.41 |
| 1/23/2025 0:19 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 1.58385142 | 164,172.52 |
| 1/23/2025 19:46 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 1.1574101 | 122,095.25 |
| 1/24/2025 8:17 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 0.44078359 | 46,308.92 |
| 1/24/2025 22:31 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 3.12405256 | 328,415.43 |
| 1/27/2025 16:01 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 2.61344924 | 264,296.62 |
| 1/28/2025 18:27 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 3.07609017 | 315,650.57 |
| 1/29/2025 22:25 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 2.95669072 | 306,775.39 |
| 2/3/2025 15:39 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 0.54630665 | 52,813.18 |
| 2/4/2025 17:29 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 1.34548009 | 133,371.73 |
| 2/5/2025 19:48 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 0.31823828 | 30,784.10 |
| 2/6/2025 16:36 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 0.42568838 | 41,424.33 |

| 2/6/2025 23:53 | 3C57ymgJs7sG1DRMjfYLvjdWGFKXsYex7u | 7.71999115 | 748,355.60 |
|---|---|---|---|
| **Total** | | 34.51204962 | 3,456,287.66 |

106.    A visual representation of these transactions is below:



107.    3C57 is a consolidation address for this scam, in which multiple victim's funds were eventually sent to, as will be discussed later in this affidavit. In the case of P.V.'s funds, upon transfer to 3C57, the funds were consolidated and then moved through the laundering network in three groups. For the purposes of the affidavit, they will be referred to as the "Green," "Orange," and "Purple" flows.

*Green Flow*

108.    Between January 11, 2025, and January 17, 2025, six transfers traceable to P.V. were made from bc1qav to 3C57.  During this period, 3C57 did not conduct any withdrawals, and each transfer was comingled within the address, eventually totaling approximately 8.60402282 BTC, valued at around $897,968.  Within an hour of the last of these six transfers to 3C57 on January 16, 2025, 3C57 withdrew approximately 8.604023 BTC, sending it to bc1q43s8u6q69aefx7j67el8vgszkr0655u303v24s, where it was comingled with other funds obtained from additional victims of this scam.  Hours later, approximately 11.02869776 BTC was sent            from            bc1q43s8u6q69aefx7j67el8vgszkr0655u303v24s            to bc1p7pwqnm0j45dly8desyjfqrfz90m9nkaqae7mxh78qy4rvnx95ldsxsyx9h, where it remained until on or about January 19, 2025.  On or about January 19, 2025, at around 2:33 PM, bc1p7pwqnm0j45dly8desyjfqrfz90m9nkaqae7mxh78qy4rvnx95ldsxsyx9h sent approximately 10 BTC to 1FidzztYHipKkCnk28m73EtrwVzogMMdMY (1Fid).

109.    Within a minute of receiving the approximately 10 BTC, 1Fid began withdrawing the BTC, sending it to ChangeNow.  In an almost identical method to that used in the flow of S.K.'s funds, on January 19, 2025, 1Fid sent approximately 10 BTC, valued at about $1,044,292.00 to ChangeNow over the course of about 23 transactions.  A visual representation of these transactions is below:



110.    Law Enforcement requested records from ChangeNow regarding the 23 transactions sent to ChangeNow from 1Fid, requesting the cryptocurrency type the BTC was swapped for, the address(es) it was sent to, and the specific output transaction hashes for each input from 1Fid.  The records from ChangeNow indicate that all 23 transactions were swapped from BTC to USDT, for a total of approximately 1,037,300.61 USDT on the Tron ("TRX") network, and sent to one of two addresses, TTcunQrzw7zHLu3W7XxLU2bU8JJR3Mbf2X ("TTcu"), which received 12 transfers, totaling about 535,918.93 USDT, and TQFaQS6Mitb4sSVfi3k1LdUgvkwUpAUp3i ("TQFa"), which received 11 transfers, totaling about 501,381.68 USDT.

111.    On or about January 20, 2025, both TTcu and TQFa sent those funds, 535,918.93 USDT and 501,381.68 USDT respectively, to THpZLZFx4DEvqAKFCT19rY6qkS5dfcQtcJ (THpZ), where they were consolidated.

112.    Following those transfers, THpZ conducted a series of transactions, sending the approximately 1,037,300.61 USDT to various other addresses.  These addresses continued the laundering of the funds within the laundering network, though no funds or addresses were able to be frozen as a result.  A visual representation of these transactions is below:



*Orange Flow*

113.    Between January 23, 2025, and January 29, 2025, bc1qav completed about seven additional transfers, totaling approximately 14.9523278 BTC (valued at about $1,571,916.00) traceable to P.V., to 3C57.  On or about January 30, 2025, 3C57 transferred 14.95231171 BTC to bc1qctgnswf7zvn4gq33pll348k9fumw0r3hj0t3l9, where it was comingled with BTC traceable to additional victims of this scam, totaling approximately 19.94674796 BTC.

114.    The    following    day,    on    or    about    January    31,    2025, bc1qctgnswf7zvn4gq33pll348k9fumw0r3hj0t3l9 transferred 19.94670666 BTC to 18vx, where it was comingled with more BTC traceable to additional victims, including the BTC deposit to 18vx previously described and traceable to S.K.  A visual representation of these transactions is below:



115.    From this point, the BTC traceable to P.V. was laundered within the same transactions as previously described in the orange and purple flows related to S.K.  A visual representation of these transactions is below:





116.    Between February 3, 2025, and February 7, 2025, bc1qav completed about five additional transfers, totaling approximately 10.35570455 BTC (valued at about $1,009,327), traceable to P.V., to 3C57.  On or about February 11, 2025, at around 6:52 PM, 3C57 transferred approximately 10.35570455 BTC to bc1qyd47aueae0k658r35w8a3rk4hle95ypqcdzlmj, where it was comingled with BTC traceable to additional victims of this scam, totaling approximately 18.58846555BTC.

117.    Hours later, at around 9:44 PM, bc1qyd47aueae0k658r35w8a3rk4hle95ypqcdzlmj sent approximately 18.58846555 BTC to 3Hkx.  At this time, the 18.58846555 BTC was comingled with the previously described deposit of 13.361312 BTC which contained funds traceable to S.K. and was transferred to 3Hkx approximately 8 minutes prior.  A visual

representation of these transactions is below:



118.   From this point, the BTC traceable to P.V. was laundered within the same transactions as previously described in the orange and purple flows related to S.K.  A visual representation of these transactions is below:





119.    A visual of the totality of the flow of P.V.'s funds is below:



*Flow of the Overall Scheme and Identification of Additional Victims*

120.    The flow of S.K. and P.V.'s funds, while indicative, do not show the totality and scale of the laundering network for all victims related to this scheme.  While the FBI was monitoring the above-described transactions, particularly the transactions leading to the freezing of the previously described 20+ TRX addresses, the FBI also monitored further transactions that appeared to involve the same laundering pattern.  These transactions were sent from addresses that directly and/or indirectly received funds from addresses already known to be involved in this scheme.  Additionally, the FBI performed blockchain analysis to trace the above-described transactions, and others, backwards to identify other 0-Level addresses, and thereafter additional victims, not previously discussed.

121.    As a result of the additional tracing conducted by the FBI, many of the initial deposits made to the identified 0-Level addresses were completed from addresses associated with accounts held at various cryptocurrency exchanges, including, but not limited to, Coinbase, Kraken, Crypto.com, Strike, and Robinhood.  Legal process was sent to these exchanges to identify account holders, who are likely victims, that initiated these transactions.  Upon review of the information obtained from this legal process, as well as reviews of complaints submitted to the FBI's Internet Crime Complaint Center ("IC3"), the FBI has so far identified at least 43 victims, who in total, suffered approximately $10,515,936.27 of losses.

122.    Each of the at least 43 victims initially withdrew funds placed into an account held at one or more of the varieties of cryptocurrency exchanges and sent to a 0-Level address.  This specific scam did not have a uniformed laundering path used for each victim.  Some victims sent their initial transaction to one or more 0-Level Address that was generated specifically for them.  Upon those transfers, the deposits made by the victims were then transferred to one, or more, of six consolidation clusters.

123.    A cluster, as opposed to an address, is a group of addresses belonging to the same wallet.    Individual wallets may, and frequently do, hold more than one bitcoin address.  When multiple bitcoin addresses contribute bitcoin to a single transaction (i.e., Address 1 provides .5 btc, Address 2 provides .5 btc, and address 3 provides 1 btc, all of which is sent within the same transaction to Address 4, which receives 2 btc), it is referred to as co-spending.  In order to co-spend, generally speaking, addresses must be controlled by the same wallet.  Therefore, when addresses co-spend, they can reliably grouped together and considered controlled by the same entity.

124.    Alternatively, many victims were not provided separate, unique, 0-Level addresses, and instead were told to send their funds to one or more address contained within one or more of the six consolidation clusters.  Thus, in essence, regardless of the address(es) victims initially sent their funds to, those funds were all eventually sent to one or more of the six consolidation clusters.  A list of each consolidation cluster and the number of associated addresses contained within the cluster is below:

| CLUSTER ID | ADDRESSES |
|---|---|
| 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr | 205 |
| 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz | 206 |
| 3CfNRPEuJtBHwKdp9gxt3tGiathnWdGa85 | 132 |
| 3JspzU9quTWcXgKAELfSDtuG6BiGuoU9fN | 170 |
| 3L8FN3goZAcGQ4cy2rCWU7JHEy9GcCT1WL | 143 |
| 355C4GpjY5rhsMaC2KpvkRpAyxWAaV62PM | 136 |

125.    A breakdown of specific identified victims, their total losses, and what cluster their funds were sent to is below:

| VICTIM | TOTAL LOSSES | CLUSTER SENT TO |
|---|---|---|
| A.V. | $            16,484.99 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| B.A. | $            16,401.08 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| M.K. | $          149,898.91 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |

| | | | |
|---|---|---|---|
| Mo.Mo. | $ | 810,935.68 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| H.S. | $ | 198,088.19 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| T.G. | $ | 49,872.84 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| M.Y. | $ | 26,308.71 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| M.V.G. | $ | 36,945.00 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| S.E.J. | $ | 104,559.00 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| K.E. | $ | 91,877.00 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| P.V. | $ | 3,451,649.35 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| L.K. | $ | 107,181.59 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| B.P. | $ | 29,650.94 | 34FvSzF5uVoSN3UfH9JUUEYQRYvMRXcLdr |
| T.N. | $ | 51,515.11 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| S.K. | $ | 223,748.87 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| A.C. | $ | 193,454.16 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| G.H. | $ | 67,983.16 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| R.H. | $ | 733,025.93 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| Ma.Ma. | $ | 2,280,701.48 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| Te.Ak. | $ | 57,161.31 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| C.M. | $ | 120,993.77 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| A.P. | $ | 92,547.40 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| Do.Dy. | $ | 20,643.09 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| C.K. | $ | 57,201.00 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| B.E.A. | $ | 120,854.00 | 3A6wkYQHhevjZxbNHvhAo7EA5q7v1D8RPz |
| Sc.Ki. | $ | 113,132.94 | 3CfNRPEuJtBHwKdp9gxt3tGiathnWdGa85 |
| T.A. | $ | 33,960.41 | 3JspzU9quTWcXgKAELfSDtuG6BiGuoU9fN |
| D.B. | $ | 12,205.42 | 3JspzU9quTWcXgKAELfSDtuG6BiGuoU9fN |
| V.S.M. | $ | 35,339.82 | 3JspzU9quTWcXgKAELfSDtuG6BiGuoU9fN |
| J.P. | $ | 61,687.53 | 3JspzU9quTWcXgKAELfSDtuG6BiGuoU9fN |
| N.L. | $ | 84,154.96 | 3JspzU9quTWcXgKAELfSDtuG6BiGuoU9fN |
| P.C. | $ | 53,285.95 | 3JspzU9quTWcXgKAELfSDtuG6BiGuoU9fN |
| C.S. | $ | 55,478.00 | 3JspzU9quTWcXgKAELfSDtuG6BiGuoU9fN |
| A.F. | $ | 9,119.00 | 3JspzU9quTWcXgKAELfSDtuG6BiGuoU9fN |
| K.O. | $ | 115,941.00 | 3JspzU9quTWcXgKAELfSDtuG6BiGuoU9fN |
| Da.Dy. | $ | 52,773.80 | 3L8FN3goZAcGQ4cy2rCWU7JHEy9GcCT1WL |
| J.B. | $ | 246,236.21 | 3L8FN3goZAcGQ4cy2rCWU7JHEy9GcCT1WL |
| D.R. | $ | 3,031.59 | 355C4GpjY5rhsMaC2KpvkRpAyxWAaV62PM |
| D.N. | $ | 14,188.86 | 355C4GpjY5rhsMaC2KpvkRpAyxWAaV62PM |
| Sa.Ka. | $ | 16,109.32 | 355C4GpjY5rhsMaC2KpvkRpAyxWAaV62PM |
| M.B. | $ | 156,236.41 | 355C4GpjY5rhsMaC2KpvkRpAyxWAaV62PM |
| J.V. | $ | 342,108.72 | 355C4GpjY5rhsMaC2KpvkRpAyxWAaV62PM |
| P.B. | $ | 1,263.77 | 355C4GpjY5rhsMaC2KpvkRpAyxWAaV62PM |
| **TOTAL** | **$** | **10,515,936.27** | |

126.    Upon deposit into the one of the six consolidation clusters, the victim funds were moved into the greater money laundering network.  The movement of funds follows the same general path as laid out in the *green, orange, and purple* flow sections related to P.V. and S.K.

127.    First, the funds from the six consolidation addresses were further consolidated, through one or more of 18 different intermediary addresses, into three main BTC clusters, the aforementioned bc1p7p, 3Hkx, and 18vx clusters.  A visual representation of this further consolidation is below:



128.    Between on or about February 27, 2025, and April 24, 2025, bc1p7p received approximately 38.299171 BTC, over the course of 8 transactions, traceable to one or more of the 6 clusters which received victim funds.

129.    Between on or about February 11, 2025, and March 23, 2025, 3Hkx received approximately 39.217028 BTC, over the course of 6 transactions, traceable to one or more of the 6 clusters which received victim funds.

130.    Between on or about January 30, 2025, and January 31, 2025, 18vx received approximately 35.095349 BTC, over the course of 6 transactions, traceable to one or more of the 6 clusters which received victim funds.

131.    In sum, all of the above bitcoin received by bc1p7p, 3Hkx, and 18vx, can be traced to one or more of the 6 clusters, and therefore further traced to victim deposits or funds comingled with victim deposits.

132.    Upon the re-consolidation into bc1p7p, 3Hkx, and 18vx clusters, the BTC was then moved through another chain of intermediary addresses, eventually being sent through ChangeNow or through 13ueM48pU7d9gBwvh4Reefi6yFCyZT3wjW (CHEN's BINANCE ACCOUNT). With the exception of a handful of transfers to better position the BTC for further movement occurring on or about March 21, 2025, and May 18, 2025, the vast majority of the transfers from bc1p7p, 3Hkx, and 18vx to either ChangeNow or CHEN occurred between on or about April 25, 2025, through April 27, 2025, between on or about May 8, 2025, through May 9, 2025, or between on or about June 24, 2025, and June 25, 2025.  A visual representation of these transfers is below:



133.    Following the various transfers to CHEN's account and ChangeNow, all BTC was swapped for USDT on Tron and sent to various Tron addresses.  The totality of funds laundered through CHEN's account was previously described, with no additional transfers to describe related to the greater laundering flow.

134.    However, while the transfers of BTC to ChangeNow from 1Fid, 122n, and 19Lg were previously described, additional transfers of funds related to this scam were also sent to ChangeNow from addresses 1AB7uxdoktRVYx1u5ouxYBbfBzF4A3PtDr (1AB7), which swapped approximately 10.599286 BTC (valued at about $1,137,282), 1PRwXp6ZqpG8Y5h9Pj9p6jiY5CPWv9o7Ti ("1PRw"), which swapped approximately 5 BTC (valued at about $515,909), 163JvY3UqCs7bjdcX6eYs9t7DnsnGXgvqF (163J), which swapped approximately 13.093134 BTC (valued at about $1,347,799), and 12RDVeeLPDpmoyt3CT7aHQrPf4EdqRqPCB (12RD), which swapped approximately 10 BTC (valued at about $1,031,817).

135. Although, as previously described related to the flow of S.K.'s funds, 1Fid did swap BTC to USDT using ChangeNow, none of the funds related to these swaps were frozen and are therefore not included in the further discussion.

136. In total, the swaps conducted by 122n, 19Lg, 1AB7, 1PRw, 163J, and 12RD, resulted in approximately 58.259367 BTC, valued at approximately $6,076,605, swapped for USDT on Tron. Of that, approximately 5,631,971.47 USDT was transferred to one of ten Tron addresses.

137. A similar laundering pattern was used for the funds previously identified by the Alabama Security Commission, which contain losses traceable to at least 50 additional victims. While these additional victims were duped by the same scam, in this case, these victims were told to invest using Ethereum based cryptocurrencies instead of BTC.

138. Nevertheless, following the deposits made by victims, the funds were moved through at least 5 ETH addresses, eventually being sent to 0xa24082f38a61b67bcfe182ce21f8ee92688f6f4a ("0xa2"). 0xa2 then used a different swapping service, this time a decentralized exchange, Tokenlon, to swap approximately 433.78 ETH for about 673,571.355484 USDT, and bridge the USDT to the Tron network.

139. Once the USDT received as a result of the swapped BTC and ETH was received on the Tron Network, the funds were again re-consolidated into one of four Tron addresses, which then further laundered the funds. These funds were sent to, or through, on or more of a series of an additional 26 Tron addresses. Included within these 26 Tron Addresses are SUBJECT ADDRESSES 13-27, all of which received funds traceable to the victims identified by the FBI, the Alabama Security Commission, or funds traceable to victims of both.

140. As previously described, SUBJECT ADDRESSES 1-13 all contain USDT

traceable to the swaps conducted through CHEN's BINANCE ACCOUNT, which in turn are traceable to the funds contained within bc1p7p, 3Hkx, and 18vx, and are therefore also traceable to victim funds.

141. The SUBJECT ADDRESSES, therefore, all contain a combination of proceeds directly traceable to victims, as well as funds involved in the laundering of the funds traceable to victims.

142. As funds were laundered, the FBI and Alabama Security Commission submitted requests to Tether to freeze identified addresses which contained funds traceable to and involved in the laundering of fraudulently obtained cryptocurrency. A visual representation of these transfers and related addresses is below. The color-coded lines show the flow of specific funds that were frozen, showing which BTC or ETH address sent the funds and what addresses the funds moved through once swapped to USDT. USDT Addresses that were frozen colored in red.



*Freezing of Subject Addresses*

143.    In total, the FBI submitted four freeze requests to Tether as the investigation and laundering scheme unfolded.

144.    On or about April 28, 2025, the FBI submitted a freeze request to Tether for the 12 addresses which received proceeds laundered through CHEN's Binance account.    On the same date, Tether agreed to place a freeze on the following addresses:

TA3c4wBFcdZfEZkeiW6QhKJa9Kcwv1W55j
TBcfznw2PooPj5aPkB6AYwUWeoF8E72Gpo

| |
|---|
| TEsSgbNw7J4H5UMZWZWrL5nA4MuP5jc9oV |
| TGGSCJKPBw3mz1K7L8L41SaSW2DFM9Mgqr |
| TJ6RUZwBDJkcuUxwmUNxaWpMNhG6NyBAvN |
| TLxAtJzreTPWBHeiqxUSyu4fi5GjKRaoFB |
| TQXYaZo7Ngw8kFdohJ8i23j3PvEay2vCrL |
| TS9k5CvUYs1tXQiiHPP3dWSUFHrXctEHDK |
| TTcpAcWJorbyb3BXFAELGoLnV5SpnNNSiK |
| TUvuJHaRPKzzf16uYXZUwE3uFwD8pEMnYF |
| TWUrgar2oHhNZPmcboo3Fk5CndAbp62yyw |
| TXnyx2jJppWeK79w85264js3RzcrJ1edXz |

145.    On or about June 26, 2025, the FBI submitted a second freeze request to Tether. This request was in relation to funds swapped via ChangeNow that were sent by 1AB7 and 122n. On the same date, Tether agreed to place a freeze on the following addresses:

| |
|---|
| TAp3RJm4E8tpzWhfY3wAS3Q1U6W8qfj2p9 |
| TPr7RMLZ2mc3o3Rs2Eym4992c9QJZvys5X |
| TQoXBvGnbDPyCVmkwEPCzJxj4pCzmDEMf8 |
| TRD9cngmDuuWExssUDiAVYXgEWtjVUUz9S |
| TVR28b62BK656d7xzsHYAKDbfZtDGTvVPW |
| TYk5GXFNpoTLXgpxFSmxuPhJcs51MFVGUa |

146.    In the same request on or about June 26, 2025, the FBI additionally requested the freezing of addresses TTmsFaDrofz7gHgEQAUqvLnT9atTW9bHGG and TUc8xE7yndCPkWf6WeaHB141k29KmtvhtR.  However, Tether informed the FBI that Tether had already received and agreed to a request to freeze both addresses made by the Alabama Security Commission.  As a result of that request, both addresses were also frozen by Tether.

147.    On or about June 27, 2025, the FBI submitted a third request to Tether.  This request was in relation to funds swapped via ChangeNow that were sent by 1AB7 and 122n.  On the same date, Tether agreed to place a freeze on the following addresses:

| |
|---|
| THU2wURynjD2C2M128TC23RV8ART8EfCAx |
| TL5A1YCvTNypfQHspwRttpbUSXMt93EM89 |
| TQmJ6DXRuEbEyrThMi4BrhSjkCfc95B4YV |

148.    On or about July 1, 2025, the FBI submitted a fourth request to Tether.  This request was in relation to funds swapped via ChangeNow that were sent by 19Lg.  On the same date, Tether agreed to place a freeze on the following addresses:

> TNj3hA82arVQ5MM2RNKDqgxhrGem8qfk3b
> TC8G1WqbzsNAjFMi58RdTG7XDs3ebDkQxn

149.    The Alabama Security Commission, in their request to Tether to freeze TTmsFaDrofz7gHgEQAUqvLnT9atTW9bHGG                                       and TUc8xE7yndCPkWf6WeaHB141k29KmtvhtR,    also    requested    that    Tether    freeze TUgSsAB3pDjofFgEQnthJnfao1KvZQUSq5  and  TWB5pVteZ5ce2pNG6iX2yaBs3rinXYa437. As a result of that request, Tether also froze both of those addresses.

150.    In total, 28 addresses were frozen, all of which contain funds which are traceable to victim losses and/or funds which were involved in the overall laundering of those victims' funds. A complete list of frozen addressees and the amounts frozen within them is below:

| FROZEN ADDRESS | SUBJECT ADDRESS | FROZEN BALANCE | SWAP SERVICE |
|---|---|---|---|
| TA3c4wBFcdZfEZkeiW6QhKJa9Kcwv1W55j | SUBJECT ADDRESS 1 | 490,000.0000 | CHEN BINANCE |
| TBcfznw2PooPj5aPkB6AYwUWeoF8E72Gpo | SUBJECT ADDRESS 2 | 470,000.0000 | CHEN BINANCE |
| TEsSgbNw7J4H5UMZWZWrL5nA4MuP5jc9oV | SUBJECT ADDRESS 3 | 518,000.0000 | CHEN BINANCE |
| TGGSCJKPBw3mz1K7L8L41SaSW2DFM9Mgqr | SUBJECT ADDRESS 4 | 467,000.0000 | CHEN BINANCE |
| TJ6RUZwBDJkcuUxwmUNxaWpMNhG6NyBAvN | SUBJECT ADDRESS 5 | 430,000.0000 | CHEN BINANCE |
| TLxAtJzreTPWBHeiqxUSyu4fi5GjKRaoFB | SUBJECT ADDRESS 6 | 327,087.6562 | CHEN BINANCE |
| TQXYaZo7Ngw8kFdohJ8i23j3PvEay2vCrL | SUBJECT ADDRESS 7 | 510,000.0000 | CHEN BINANCE |
| TS9k5CvUYs1tXQiiHPP3dWSUFHrXctEHDK | SUBJECT ADDRESS 8 | 398,771.4690 | CHEN BINANCE |
| TTcpAcWJorbyb3BXFAELGoLnV5SpnNNSiK | SUBJECT ADDRESS 9 | 920,700.0000 | CHEN BINANCE |

| | | | |
|---|---|---|---|
| TUvuJHaRPKzzf16uYXZUwE3uFwD8pEMnYF | SUBJECT ADDRESS 10 | 475,880.0000 | CHEN BINANCE |
| TWUrgar2oHhNZPmcboo3Fk5CndAbp62yyw | SUBJECT ADDRESS 11 | 469,800.0000 | CHEN BINANCE |
| TXnyx2jJppWeK79w85264js3RzcrJ1edXz | SUBJECT ADDRESS 12 | 469,000.0000 | CHEN BINANCE |
| TAp3RJm4E8tpzWhfY3wAS3Q1U6W8qfj2p9 | SUBJECT ADDRESS 13 | 22,848.6325 | ChangeNow |
| TPr7RMLZ2mc3o3Rs2Eym4992c9QJZvys5X | SUBJECT ADDRESS 14 | 276,125.7556 | ChangeNow |
| TQoXBvGnbDPyCVmkwEPCzJxj4pCzmDEMf8 | SUBJECT ADDRESS 15 | 154,430.8861 | ChangeNow |
| TRD9cngmDuuWExssUDiAVYXgEWtjVUUz9S | SUBJECT ADDRESS 16 | 143,969.7169 | ChangeNow |
| TVR28b62BK656d7xzsHYAKDbfZtDGTvVPW | SUBJECT ADDRESS 17 | 83,898.9966 | ChangeNow |
| TYk5GXFNpoTLXgpxFSmxuPhJcs51MFVGUa | SUBJECT ADDRESS 18 | 43,070.0877 | ChangeNow |
| THU2wURynjD2C2M128TC23RV8ART8EfCAx | SUBJECT ADDRESS 19 | 421,292.0000 | ChangeNow |
| TL5A1YCvTNypfQHspwRttpbUSXMt93EM89 | SUBJECT ADDRESS 20 | 33,420.2268 | ChangeNow |
| TQmJ6DXRuEbEyrThMi4BrhSjkCfc95B4YV | SUBJECT ADDRESS 21 | 19,580.0000 | ChangeNow |
| TNj3hA82arVQ5MM2RNKDqgxhrGem8qfk3b | SUBJECT ADDRESS 22 | 70,000.0000 | ChangeNow |
| TC8G1WqbzsNAjFMi58RdTG7XDs3ebDkQxn | SUBJECT ADDRESS 23 | 200,000.0000 | ChangeNow |
| TTmsFaDrofz7gHgEQAUqvLnT9atTW9bHGG | SUBJECT ADDRESS 24 | 368,513.0000 | ChangeNow |
| TUc8xE7yndCPkWf6WeaHB141k29KmtvhtR | SUBJECT ADDRESS 25 | 315,675.9340 | ChangeNow |
| TUgSsAB3pDjofFgEQnthJnfao1KvZQUSq5 | SUBJECT ADDRESS 26 | 360,895.0000 | ChangeNow |
| TWB5pVteZ5ce2pNG6iX2yaBs3rinXYa437 | SUBJECT ADDRESS 27 | 84,211.0000 | ChangeNow |
| **TOTAL USDT BALANCE** | | **8,544,170.3613** | |

151.    While all of the SUBJECT ADDRESSES have received funds traceable to at least one of the six BTC addresses and one ETH address which swapped BTC or ETH for USDT, the tracing and blockchain analysis conducted by the FBI shows that, at the time that the SUBJECT ADDRESSES 1 – 12 were frozen, the funds contained within them are traceable to the funds previously held within 3QPv, and that at the time 13 – 25 were frozen, the funds contained within them are traceable to the output transactions from the ChangeNow swaps initiated by 1AB7, 122n, and 19Lg.  As previously described, the funds contained within 3QPv, 1AB7, 122n, and 19Lg are all traceable to a combination of the 36 victims identified by the FBI, with excess funds likely traceable to additional victims that either have not yet been identified or victims who cannot be identified.

**D.    All of the funds the SUBJECT ADDRESSES are forfeitable because they facilitated, and were therefore involved in, concealment money laundering.**

152.    The funds in the SUBJECT ADDRESSES were used to commit, and were therefore involved in, concealment money laundering.

153.    At each stage above, various methods commonly used by individuals laundering money were used to thwart law enforcement's ability to trace, and ultimately recover, any illicit proceeds. Those methods include:

- **Use of Unattributable "0-Level" Deposit Addresses.**  0-Level addresses, as previously described, are unattributable for many victims, who therefore are not aware of where their funds are actually being sent.  Criminals usually provide 0-Level addresses associated with unhosted wallets to evade identification or potential interference.

- **Use of Centralized and/or Decentralized Exchanges (DEX).**  These exchanges, whether centralized, such as Binance in this case, or decentralized, such as ChangeNow and Tokenlon, allow users to quickly swap one cryptocurrency type for another.  This swapping through these exchanges if often done for a variety of reasons, however, it is predominantly done either to a) swap to a more desirable cryptocurrency, or b) break the transaction chain and making further tracing more difficult or time consuming.

- **Swapping for Stablecoins, Especially USDT.**  CIF scammers involved in laundering victims' funds regularly exchange or swap the non-stablecoin cryptocurrencies that victims send for stablecoins, specifically USDT.  Based on my experience investigating CIF, money launderers are particularly drawn to USDT because of its low transactions fees and stability compared to other more volatile cryptocurrencies. Additionally, USDT is compatible on several different blockchains, which makes it easier to move funds across blockchains to further obfuscate the nature, source, control, and/or ownership of criminal proceeds.

- **High Velocity Flow of Funds to Consolidation Wallet**.  Once deposited into the 0-Level Address, it is common for the funds to be transferred quickly from address

to address before reaching the consolidation wallet, where the funds will rest for a longer period, allowing criminals time to comingle those funds with other illicit gains before moving the funds again from the consolidation wallet towards a cash-out point where they can convert the pool of funds to fiat currency. The transactions related to the 36 FBI identified victims, including S.K. and P.V.'s funds, reflect this method on numerous occasions by being transferred into, and out of, addresses within minutes to hours.

- **Use of Consolidation Wallet to Comingle Funds.** Defined as the "layering" stage of money-laundering, funds derived from multiple victims are routed to the same address, where they are comingled, consolidated, and transferred together downstream. Criminals use consolidation wallets to obfuscate the source of funds and complicate tracing efforts by investigators. All of the funds traceable to the 36 FBI identified victims, including S.K and P.V., were comingled at almost every step, and ultimately passed through multiple consolidation wallets containing other victims' funds before being sent to, or passing through, the **SUBJECT ADDRESSES 1 - 27**.

154. There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers using these methods. Whether transferring BTC or TRX and USDT, each individual cryptocurrency transfer costs money. For USDT, that cost comes through the payment of transactions fees, or "gas" fees, required by the Tron blockchain. It is reasonable to assume that businesses and individuals would strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible. Furthermore, each transaction delays the whole process, defeating one of the key attributes of cryptocurrency as a quick means of exchange.

155. Most legitimate businesses, trying to minimize costs and unconcerned with obfuscating the source of funds, prefer using "retail" exchanges. Retail exchanges, like Coinbase or Crypto.com, can consolidate transactions, resulting in lower fees for customers. Criminals

laundering through cryptocurrency, however, often avoid these retail exchanges as much as possible, unless using them quickly to swap and/or bridge their cryptocurrency, since they are readily identifiable on blockchain analysis tools, often require that customers provide Know-Your-Customer ("KYC") information and are often responsive to legal process.

156.    The blockchain analysis in this case demonstrates such conduct.  Specifically, that analysis shows that the funds—proceeds of the fraud scheme—were broken up, distributed through a series of cryptocurrency wallets via rapid transactions, and re-consolidated with other funds in the SUBJECT ADDRESSES.  The commission of these convoluted, intermingled, and re-consolidated transactions—which incurred transaction fees and served no apparent legitimate purpose—imply that the purpose of these numerous, fast-repeating, and intermingled transactions was to conceal the nature, source, location, ownership and control of the proceeds.

157.    Furthermore, the transfer of fraud proceeds from multiple victims into the same wallet address or financial account  via transactions committed within a relatively short time period strongly indicates that the other funds contained in that wallet address or account are also fraud proceeds and, likewise, that the wallet address or account is being used to collect conceal, and launder those funds.  As shown above, this matter involves such transfers of criminal proceeds obtained from multiple victims into the SUBJECT ADDRESSES.  This "collection" of criminal proceeds from multiple victims into the SUBJECT ADDRESSES provides a further and independent basis to find probable cause to believe that: (a) the SUBJECT ADDRESSES are being used to collect, conceal, and laundering criminal proceeds; (b) all the funds currently on deposit in the SUBJECT ADDRESSES are traceable to the proceeds of wire fraud, a specified unlawful activity; and (c) all the funds in the SUBJECT ADDRESSES have been involved in money laundering transactions designed to conceal the nature, source, ownership, location, and control of those proceeds of specified unlawful activity.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. § 981(a)(1)(C))

158.    The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

159.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(A))

160.    The Defendant Property constitutes property involved (a) domestic and international concealment of money laundering transactions committed in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i), (b) a conspiracy to engage in money laundering, committed in violation of Title 18, United States Code, Section 1956(h).

161.    Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

### PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

\* \* \*

Respectfully submitted,
JEANINE FERRIS PIRRO
United States Attorney

*/s/ Rick Blaylock, Jr.*
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

**VERIFICATION**

I, Corey Carnahan, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 1st day of July 2026.

Corey Carnahan
Special Agent
Federal Bureau of Investigation